FILED
CLERK

12/30/2013 9:49 am

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X
KAREN A. MILLER,

                    Plaintiff,

   -vs.-

COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION,

                  Defendant.
---------------------------------------------------------X

**MEMORANDUM OF DECISION AND ORDER**
13-cv-1648 (ADS)

**APPEARANCES:**

**Fusco, Brandenstein & Rada, PC**
*Attorneys for the Plaintiff*
180 Froehlich Farm Boulevard
Woodbury, NY 11797
    By: Aba Heiman, Esq., Of Counsel

**Loretta E. Lynch, United States Attorney, Eastern District Of New York**
*Attorneys for the Defendant*
271 Cadman Plaza East
Brooklyn, NY 11201
    By: Candace Scott Appleton, Assistant United States Attorney

**SPATT, District Judge**.

    The Plaintiff Karen Anne Miller ("Miller" or the "Plaintiff") seeks review of the final decision of the Commissioner of Social Security (the "Commissioner") that she was not disabled during the relevant time periods and, therefore, she was not entitled to disability benefits on her own earnings record or disabled widows' benefits as provided for in Title II of the Social Security Act, 42 U.S.C. §§ 401-434.  Both parties have moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.").

    The Plaintiff contends that the Administrative Law Judge ("ALJ") and the Appeals Council erred by failing to explain why they discounted certain affirmations of her treating

1

physicians regarding Plaintiff's alleged disability. For the reasons set forth, Commissioner's motion for judgment on the pleadings is denied and the Plaintiff's cross-motion for judgment on the pleadings is granted in part and denied in part.

## I. PROCEDURAL HISTORY

On March 20, 2010, Miller filed applications for disability insurance benefits and disabled widow's benefits. (Administrative Record ("Ar.") 99-100). In both applications, Miller alleged that she was disabled as of September 29, 2009. On September 11, 2010, both claims were denied on the initial administrative review. Miller later amended the alleged onset date to September 29, 2006. At Miller's request, a hearing was held before an ALJ, Jay L. Cohen, on June 23, 2011, where Miller was represented by counsel. At the hearing, the ALJ considered, among other things, the testimony of Miller and a vocational expert, Amy H. Leopold. (Ar. 23-58).

The ALJ was also presented with two affirmations by Miller's treating physicians. The first was from Dr. Daniel H. Cohen, the treating rheumatologist, and the second was from Dr. Betty Parisis, the primary care physician. In Dr. Cohen's affirmation, he stated that Miller's "combined impairments prior to 2010, and also prior to 10/31/06, [] affected her abilities to perform basic work activities, and that she was completely disabled as of that date." (Ar. 430). In the affirmation from Dr. Parisis, she asserted that Miller's combined impairments had prevented her from performing substantial gainful activity since before October 31, 2006. (Ar. 434).

On July 1, 2011, considering the case *de novo*, the ALJ found that Miller was not disabled prior to October 31, 2006 and therefore not eligible to receive benefits. (Ar. 10-18). The ALJ's decision did not mention the two treating physician affirmations.

2

On February 13, 2013, the Appeals council denied Miller's request to review the ALJ's decision, thus rendering the ALJ's determination the final decision of the Commissioner. See Brown v. Apfel, 174 F.3d 59, 61 (2d Cir. 1999). This action followed.

## II. BACKGROUND

Miller was born in 1958. (AR 99) and attended college for two years. (Ar. 30, 129). From January 1990 to November 1997, she worked as a health aide in a school. (Ar. 30-31, 108). She assisted the nurse by administering eye and ear screenings and first aid, and completing paperwork. (Ar. 30-31, 110). She worked on the weekends as a waitress during that time period as well. (Ar. 45). Miller continued to work part time intermittently as a restaurant waitress and hostess from 1997 to November 2009. (Ar. 45).

A.  Miller's Testimony and Statements

At the June 23, 2011 hearing, Miller testified that she was unable to work as of October 2006 because of arthritis in her hands and fingers, a torn tendon in her elbow, and pain. (Ar. 31-32). She had been seeing Dr. Cohen, a rheumatologist, since 1990, and he had diagnosed her with systemic lupus. (Ar. 35). Dr. Parisis, her general physician since 2005, prescribed steroids and inhalers for her asthma, which was significant but never required an emergency room visit. (Ar. 36, 38-39). Miller testified that she had elbow surgery in April 2006, which temporarily eased her pain. (Ar. 32, 36-37).

However, Miller stated that continuing constant elbow pain prevented her from doing anything at all in October 2006. (Ar. 33, 40). She could not sit or stand very long because of hip pain. (Ar. 33). Miller estimated that, in October 2006, she could sit, stand, and walk about two hours each in an eight-hour workday, and lift up to five pounds. (Ar. 33-35). Miller stated that, in 2006, she was home a lot and did not do much because of elbow pain and arthritis. (Ar. 40).

She read, went shopping with her sister, did light cooking, sat outside, and visited friends. (Ar. 41-42). Miller drove, but did not take public transportation because she had no need for it. (Ar. 42). She had hip replacement surgery in September 2008. (Ar. 33).

B. Miller's Medical History Prior to September 29, 2006, the Alleged Onset Date

In February 1998, Miller saw Dr. Arnold Illman, an orthopedic surgeon, after injuring her right knee while skiing. (Ar. 404). On March 24, 1998, Dr. Illman performed arthroscopic knee surgery. (Ar. 395-99). Miller recovered well, and was able to do all normal activities by July 1998. (Ar. 393-94).

Miller returned to Dr. Illman on May 18, 2004, with complaints of right shoulder and neck pain of two weeks' duration. (Ar. 378-79). X-rays reportedly showed degenerative disc disease at C4-5 and C5-6. (Ar. 379). The doctor diagnosed adhesive capsulitis of the right shoulder and degenerative disc disease at C4-C5 and C5-C6, and prescribed Naprosyn and physical therapy.

On February 11, 2005, Miller consulted Dr. Charles Routolo, M.D., an orthopedist, for right shoulder pain. (Ar. 340-42). She stated that she had injured the shoulder in a motor vehicle accident on December 27, 2004. (Ar. 340). The doctor diagnosed right shoulder rotator cuff strain, possible rotator cuff tear, and bicipital tendinitis. (Ar. 342). He recommended physical therapy and an MRI.

On February 24, 2005, physical therapist Cosmo Baccarella evaluated Miller.

On May 5, 2005, Miller saw Dr. Daniel H. Cohen, the rheumatologist. (Ar. 198). Miller reported severe knee pain while she had been on a cruise that February. She had decided to increase her Prednisone dosage. On examination, Miller's joints were mobile, and there was no

4

visible synovitis, or inflammation of the joint lining. At Miller's next visit on August 9, 2005, the findings were unchanged. (Ar. 197). There was no muscle atrophy.

On December 15, 2005, Dr. Cohen noted that Miller had severe asthma, and had been prednisone-dependent until four months earlier. (Ar. 196). On examination, Dr. Cohen noted sclerodactyly, localized thickening and tightness of the skin of the fingers. Miller's joints were mobile.

On January 26, 2006, Miller saw Dr. Illman for right lateral epicondylitis, otherwise known as tennis elbow. (Ar. 290-91). X-rays were normal, and Miller was referred to physical therapy. (Ar. 291).

In February 2006, Miller reported minimal discomfort in the elbow, and Dr. Illman stated that the cortisone shot administered the prior week had worked "quite well." (Ar. 292).

In March 2006, Miller stated that her pain had returned; she had significant pain on palpation of the lateral epicondyle.

On May 10, 2006, X-rays of the right elbow taken were negative. (Ar. 317).

On May 12, 2005, Dr. Parisis conducted a general physical examination and cleared Miller for elbow surgery. (Ar. 314-15). Examination of all body systems yielded normal findings. (Ar. 315).

On May 17, 2006, Miller underwent right elbow stripping surgery. (Ar. 321). She followed up with Dr. Illman, attended physical therapy, and was recovering well. (Ar. 293).

On July 11, 2006, Dr. Illman stated that Miller had no pain, full range of motion, and normal grasp strength. (Ar. 294). She no longer required physical therapy.

5

C.  Summary of the Medical Evidence From September 29, 2006 to October 31, 2006

On October 5, 2006, Miller visited Dr. Illman and reported that her tennis elbow was asymptomatic. (Ar. 294). She had no pain on palpation. There was normal strength with the elbow extended and wrist dorsiflexed. Dr. Illman discharged Miller.

D.  Summary of the Medical Evidence After October 31, 2006

Six months later, on April 27, 2007, Miller saw Dr. Cohen. Miller stated that her exercise tolerance was good. (Ar. 195). On examination, Dr. Cohen found questionable sclerodactyly. Miller's joints were mobile.

At her next visit on November 8, 2007, Miller told Dr. Cohen that she was able to hike five miles a day despite her complaints of joint and muscle pain. (Ar. 199). On examination, there was no definite sclerodactyly, and Miller's joints were mobile.

On April 29, 2008, Miller saw Dr. Illman concerning intermittent pain in her right knee. (Ar. 299-300). The doctor's found that her right knee was "completely normal." (Ar. 300). He did not believe that Miller had any significant problem with her knee. On June 5, 2008, Dr. Illman discerned limited movement of Miller's hip on abduction and external rotation. (Ar. 301). He ordered an MRI.

The MRI of Miller's right hip performed June 11, 2008 revealed stage III avascular necrosis of the right femoral head, early degenerative disease, and large joint effusion. (Ar. 304).

On June 16, 2008, Dr. Illman recommended total right hip replacement. (Ar. 301).

On August 12, 2008, Miller told Dr. Cohen that she was going to have a total right hip replacement. (Ar. 194). On examination, Dr. Cohen found no visible synovitis, and noted that Miller's joints were mobile.

On January 7, 2009, Dr. Cohen noted that Miller had right hip replacement surgery sixteen weeks earlier. (Ar. 193). On examination, there was no visible synovitis, and Miller's joints were mobile. On May 1, 2009, the doctor's examination findings were unchanged. (Ar. 192).

On January 21, 2010, Miller saw Dr. Cohen again. (Ar. 201). Her hands were swollen, and she reported lower back pain. On examination, Dr. Cohen noted synovitis. Miller's joints were mobile. (Ar. 202).

On February 16, 2010, an MRI of Miller's lumbar spine revealed diffuse degenerative disc disease with facet arthropathy and a bulge at L3-L4. There was a five millimeter synovial cyst extending from the right facet joint at L5-S1 to the right foramen contacting the exiting right L5 nerve root.

On February 23, 2010, an MRI of the right hand revealed findings compatible with rheumatoid arthritis. Dr. Mark Decker noted that he informed Miller that the MRI showed mixed connective tissue disease ("MTCD"), a form of scleroderma.

On February 24, 2010, upon referral by Dr. Cohen, Miller saw neurologist, Dr. Ellen J. Braunstein. Miller complained of lower back pain with radiation down the right leg. (Ar. 213). On examination, Miller walked with a limp. (Ar. 214). Straight raising was positive on the right at 30 degrees. She had a depressed right ankle jerk. Other reflexes were +2, and sensation was intact. Dr. Braunstein diagnosed lumbar radiculopathy of the right lower extremity. She recommended physical therapy and prescribed Flexeril.

On March 19, 2010, Dr. Braunstein detected joint tenderness on motor testing again. (Ar. 211-12). Straight leg raising was positive bilaterally at 30 degrees. (Ar. 211). Miller had 5/5 full

7

motor strength, and sensory testing was normal. Her gait and coordination were normal. The doctor prescribed Lyrica, and referred Miller to physical therapy for her lower back.

In a letter dated March 23, 2010, Dr. Parisis stated that she had been treating Miller for the prior four years. (Ar. 179). According to Dr. Parisis, Miller was being treated for asthma, scleroderma, lupus, MCTD, lumbar spine disc disease, and severe rheumatoid arthritis. Dr. Parisis stated that Miller's arthritis disabled her, and chronic treatment with steroids resulted in an osteonecrotic right hip. Miller had difficulty using her right hand, and sitting and standing for periods of time.

On March 30, 2010, Miller saw Dr. Cohen again. (Ar. 200). She had right lower extremity pain, and Dr. Cohen stated that it was related to L5 compression by a synovial cyst. On examination, Dr. Cohen discerned synovitis, and noted that Miller's joints were mobile.

On April 9, 2010, Miller told Dr. Braunstein that she was doing better on Lyrica. She was not in severe pain; and had "twinges" occasionally. (Ar. 207).

In a letter dated April 25, 2010 from Dr. Cohen to Miller, he stated that he had first treated Miller on March 25, 1990 for sclerodorma, MCTD, and severe bronchial asthma. (Ar. 209). Dr. Cohen further stated that laboratory work revealed positive anti-Rnp and ANA, substantiating the diagnosis of MCTD with scleroderma. Avascular necrosis of Miller's hip, caused by oral corticosteroid therapy for asthma, had necessitated a total right hip replacement in 2008. More recently, Miller had developed a severe lumbar spondylosis with right sciatica and compression of the L5 nerve root by a synovial cyst. Dr. Cohen assessed that due to dyspnea, polyarthalgia and sciatica, Miller was unable to sit longer than two hours; stand longer than 30 minutes; kneel, bend, or crouch; or lift or carry weight greater than five pounds on a consistent

basis. (Ar. 210).  Miller could not consistently perform fine motor tasks with her fingers due to polyarthralgia.

On May 11, 2010, Dr. Braunstein saw Miller, and the doctor's findings were consistent with those in April of that year.  Miller stated that Lyrica was making her feel a lot better, with some grogginess. (Ar. 252).  Dr. Braunstein referred her for electromyography ("EMG"). (Ar. 253).

On May 17, 2010, EMG and nerve conduction studies of the lower extremities were within normal limits. (Ar. 254-55).

In a note dated March 16, 2011, Dr. Parisis stated that Miller had difficulty sitting and standing for periods of time due to osteonecrosis of the right hip, and difficulty using her right hand due to arthritis. (Ar. 275).  Dr. Parisis indicated that she had been treating Miller the past five years for asthma, scleroderma, lupus, MCTD, lumbar spine disc disease, and severe rheumatoid arthritis.

On March 17, 2011, Miller saw Dr. Illman again.  She complained of occasional pain in her groin, and pain in her lower back and down her leg. (Ar. 278).  On examination, Miller was wheezing. (Ar. 279).  She had pain on movement of the back, and some pain on rotation of the hip.  Dr. Illman diagnosed her condition as degeneration of the lumbar spine.  He noted that Miller had had excellent results from her total hip replacement which had been performed on September 18, 2008.  Concerning her back, the doctor stated that Miller might require epidural injections or possibly surgery.

E.   Summary of the Vocational Expert Testimony

At the June 23, 2011 hearing, Amy Peiser Leopold, an impartial vocational expert, also testified. (Ar. 47-52).  She stated that Miller's past work as a health aide was semiskilled work, which can be learned in 31 to 90 days.

F.   The ALJ Decision

By notice of decision dated July 1, 2011, ALJ Cohen denied Miller's claims for benefits. The ALJ explained that because Miller's earnings records revealed that she acquired sufficient quarters of coverage to remain insured through September 30, 2006, Miller was required to establish disability on or before that date to be entitled to a period of disability insurance benefits.

The ALJ also explained that the prescribed period for disabled widow's benefits ends with the month before the month in which the claimant turns 60 years old, or, if earlier, either 7 years after the worker's death or after the widow was last entitled to survivor's benefits, whichever is later.  The ALJ found that, in this case, Miller's prescribed period began on October 17, 1999, the date she was last entitled to survivor's benefits.  Thus, the ALJ concluded, Miller was required to establish disability on or before October 31, 2006 to be entitled to disabled widow's benefits.

The ALJ acknowledged that Miller had not engaged in substantial gainful activity since September 29, 2006, the alleged amended onset date.  The ALJ further noted that, during the relevant time periods, Miller had the following medically determinable impairments: mixed connective tissue disease with sclerdoma and asthma.  However, the ALJ found that Miller did not have an impairment or combination of impairments that significantly limited, or was expected to significantly limit, her ability to perform basic work-related activities for 12

consecutive months prior to the date last insured or the end of the prescribed period for disabled widows benefits. Again, those dates were September 30, 2006 and October 31, 2006, respectively.

> The ALJ found that
>
> the evidence as a whole as well as treatment records fail to document significant physical limitations or restrictions prior to the date last insured, September 30, 2006, or the end of the prescribed period for eligibility for disabled widow's benefits, October 31, 2006. Therefore, the undersigned accords limited weight to the opinions of Dr. Cohen and Dr. Parisis, to [the] extent that the[y] concern the relevant period for eligibility of disability benefits.

(Ar. 14). The ALJ acknowledged that Miller's "medically determinable impairments could reasonably be expected to produce the alleged systems." (Ar. 14). However, the ALJ found that

> [Miller]'s statements concern the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with finding that the [Miller] has no severe impairment or combination of impairments prior to the date last insured or the end of the prescribed period for eligibility for disabled widow's benefits.

(Ar. 14).

Finally, the ALJ noted that Miller "later developed orthopedic impairments that significantly limited [her]." (Ar. 14-15). Nonetheless, the ALJ determined that "th[ese] disabling impairments were not evident prior to the date last insured or the end of the prescribed period for eligibility for disabled widow's benefits." (Ar. 15).

G.  "New" Evidence and the Appeal

Although affirmations dated June 26, 2011 from Dr. Cohen and Dr. Parisis were submitted to the ALJ, the ALJ failed to mention these documents in his decision.

Miller appealed from the ALJ's decision. On February 13, 2013, the Social Security Administration's Appeals Council denied the request for review, stating that it "considered the reasons [Miller] disagree[s] with the decision and the additional evidence" that Miller submitted.

11

(Ar. 1). The Council concluded that the additional information "does not provide a basis for changing the [ALJ]'s decision." (Ar. 2). However, the Appeals Council decision does not state why the Council discounted the affirmations provided by Dr. Cohen and Dr. Parisis.

H. The Present Action

On March 27, 2013, Miller filed the present action. On November 8, 2013, the Commissioner moved pursuant to Fed. R. Civ. P. 12(c) for judgment on the pleadings. On November 27, 2013, Miller cross-moved for judgment on the pleadings.

### III. DISCUSSION

A. Standard of Review

In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A district court may set aside the Commissioner's determination that a claimant is not disabled, however, "only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008) (quoting Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000)) (internal quotations marks omitted). "Substantial evidence is 'more than a mere scintilla.'" Brault v. Comm'r, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam) (quoting Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009)). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. at 447–48 (internal quotation marks omitted). It is a "very deferential standard of review – even more so than the 'clearly erroneous' standard." Id. at 148 (citing Dickinson v. Zurko, 527 U.S. 150, 153 (1999)). Once the ALJ finds facts, the Court can only reject them if "a reasonable

factfinder would have to conclude otherwise." Id. (quoting Warren v. Shalala, 29 F.3d 1287, 1290 (8th Cir. 1994)).

The inquiry is based on the entire administrative record, including any new evidence submitted to the Appeals Council following the ALJ's decision. See Perez v. Chater, 77 F.3d 41, 45 (2d Cir. 1996); see also 20 C.F.R. § 404.970(b) (allowing a claimant to submit "new" evidence to the Appeals Council); id. § 416.1470(b) (same). This is the case even where, as here, the Appeals Council denies review of the ALJ's decision and the ALJ's decision is therefore the Commissioner's final decision for purposes of judicial review. See Perez, 77 F.3d at 44-45. That is because "when the Appeals Council denies review after considering new evidence, the [Commissioner's] final decision necessarily includes the Appeals Council's conclusion that the ALJ's findings remained correct despite the new evidence." Id. at 45 (internal quotation marks omitted). Thus, when, as in this case, the Appeals Council denies review after considering new evidence, the Court "simply review[s] the entire administrative record, which includes the new evidence, and determine[s], as in every case, whether there is substantial evidence to support the decision of the [Commissioner]." Id. at 46.

B. The Legal Standard for Disability Determination

"To receive federal disability benefits, an applicant must be 'disabled' within the meaning of the [Social Security] Act." Shaw, 221 F.3d at 131; see also 42 U.S.C. § 423. A claimant is "disabled" within the meaning of the Act if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be of "such severity that [the claimant] is not only unable to do his previous

13

work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. § 423(d)(2)(A).

The Social Security Administration has promulgated a five-step procedure for determining whether a claimant is "disabled" under the Act. See 20 C.F.R. § 404.1520(a)(4).

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him [per se] disabled . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012) (quoting DeChirico v. Callahan, 134 F.3d 1177, 1179–80 (2d Cir. 1998)).

Ultimately, the "burden is on the claimant to prove that he is disabled." Balsamo v. Chater, 142 F.3d 75, 80 (2d Cir. 1998) (quoting Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983)). But if the claimant shows at step four that his impairment renders him unable to perform his past work, there is a shift in the burden of proof at step five that requires the Commissioner to "show that there is work in the national economy that the claimant can do." Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam); see also Selian v. Astrue, 708 F.3d 409, 418 (2d Cir. 2013) ("The claimant bears the burden of proof in the first four steps of the sequential inquiry; the Commissioner bears the burden in the last.").

In making the determinations required by the Social Security Act and the regulations promulgated thereunder, "the Commissioner must consider (1) the objective medical facts; (2) the medical opinions of the examining or treating physicians; (3) the subjective evidence of the

claimant's symptoms submitted by the claimant, his family, and others; and (4) the claimant's educational background, age, and work experience." Pogozelski v. Barnhart, 03 CV 2914 (JG), 2004 WL 1146059, at *10 (E.D.N.Y. May 19, 2004)(citing Carroll, 705 F.2d at 642). Also, "the ALJ conducting the administrative hearing has an affirmative duty to investigate facts and develop the record where necessary to adequately assess the basis for granting or denying benefits." Id. (citing Sims v. Apfel, 530 U.S. 103, 110–11, 120 S. Ct. 2080, 147 L. Ed. 2d 80 (2000); Shaw, 221 F.3d at 134).

C.  The Legal Standard for Disabled Widow's Benefits

To prevail on her widow's benefits claim, Miller had to show that (1) she is the widow of a wage earner who died fully insured; (2) she is at least 50, but less than 60 years old; (3) she is disabled; and (4) her disability commenced within seven years of the month in which the wage earner died. See 42 U.S.C. § 402(e) (1), (e)(4). Section 423(d) of the Act sets forth the definition of disabled. It provides, in relevant part, that the Commissioner will find a claimant disabled if he or she demonstrates the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's impairment must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. § 423(d)(2)(A). Further, the disability must be "demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. § 423(d)(3).

D.  <u>The Treating Physician Rule</u>

The Commissioner must give special evidentiary weight to the opinion of a treating physician. See <u>Clark v. Comm'r of Soc. Sec.</u>, 143 F.3d 115, 118 (2d Cir. 1998). The "treating physical rule," as it is known, "mandates that the medical opinion of a claimant's treating physician [be] given controlling weight if it is well supported by the medical findings and not inconsistent with other substantial record evidence." <u>Shaw</u>, 221 F.3d at 134; <u>see</u> <u>also</u> <u>Rosa v. Callahan</u>, 168 F.3d 72, 78–79 (2d Cir. 1999); <u>Clark</u>, 143 F.3d at 118. The rule, as set forth in the regulations, provides:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(c)(2).

Furthermore, while treating physicians may share their opinion concerning a patient's inability to work and the severity of disability, the ultimate decision of whether an individual is disabled is "reserved to the Commissioner." <u>Id.</u> § 404.1527(d) (1); <u>see</u> <u>also</u> <u>Snell v. Apfel</u>, 177 F.3d 128, 133 (2d Cir. 1999) ("[T]he Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability.")

If the opinion of the treating physician as to the nature and severity of the impairment is not given controlling weight, the Commissioner must apply various factors to decide how much weight to give the opinion. See <u>Shaw</u>, 221 F.3d at 134; <u>Clark</u>, 143

16

F.3d at 118. These factors include: (i) the frequency of examination and length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors. See Clark, 143 F.3d at 118; 20 C.F.R §§ 404.1527(d)(2), 416.927(d) (2). When the Commissioner chooses not to give the treating physician's opinion controlling weight, he must "give good reasons in [his] notice of determination or decision for the weight [he] gives [the claimant's] treating source's opinion." 20 C.F.R § 404.1527(c)(2); see also Perez v. Astrue, No. 07–CV–958, 2009 WL 2496585, at *8 (E.D.N.Y. Aug. 14, 2009) ("Even if [the treating physician's] opinions do not merit controlling weight, the ALJ must explain what weight she gave those opinions and must articulate good reasons for not crediting the opinions of a claimant's treating physician."); Santiago v. Barnhart, 441 F. Supp. 2d 620, 627 (S.D.N.Y. 2006) ("Even if the treating physician's opinion is contradicted by substantial evidence and is thus not controlling, it is still entitled to significant weight because the treating source is inherently more familiar with a claimant's medical condition than are other sources." (citation and internal quotation marks omitted)). "Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." Snell, 177 F.3d at 133.

  Finally, "[e]ven if the treating physician's opinion is retrospective, it will be binding unless contradicted by other medical evidence or by 'overwhelmingly compelling' non-medical evidence." Fuller v. Astrue, 09-CV-6559 (MAT), 2010 WL 3516935, at *8 (W.D.N.Y. Sept. 7, 2010)(citation and quotation marks omitted).

E.   Analysis

In this case, the ALJ discounted the opinions of the treating physicians, Dr. Daniel H. Cohen and Dr. Betty Parisi, as contrary to the record as a whole. In particular, the ALJ accorded "limited weight" to their opinions because, in the ALJ's view, "the evidence as a whole as well as treatment records fail to document significant physical limitations or restrictions" prior to the date last insured or the end of the prescribed period for eligibility for disabled widows' benefits. However, for some unexplained reason, the ALJ failed to address the affirmations from Dr. Cohen and Dr. Parisi, dated June 21, 2011.

As noted above, Dr. Cohen stated that the Plaintiff was "completely disabled" prior to October 31, 2006. "Although the ALJ was not required to determine that [the P]laintiff was disabled solely because of Dr. [Cohen]'s conclusion, the ALJ failed to even acknowledge Dr. [Cohen]'s assessment that [the P]laintiff was disabled and [adequately] explain the rationale for not crediting the doctor's opinion, as required by the case law and statutes." Hynes v. Astrue, 12-CV-719 JFB, 2013 WL 3244825, at *10 (E.D.N.Y. June 26, 2013); Taylor v. Barnhart, 117 F. App'x 139, 140–41 (2d Cir. 2004) (remanding case because ALJ "did not give sufficient reasons explaining how, and on the basis of what factors, [the treating physician's] opinion was weighed," and stating that "we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion" (citation and internal quotation marks omitted)); Featherly v. Astrue, 793 F.Supp.2d 627, 632 (W.D.N.Y. 2011) (remanding case when ALJ's opinion contained only a "conclusory discussion" of the reasons for assigning certain weight to two of plaintiff's treating physicians and failed to mention the weight assigned to the opinions of other treating physicians).

Further, the Appeals Council, taking into account these affirmations, denied Miller's request for review, but without specifying its reasons for doing so. Miller asserts that the Appeals Council's "boilerplate" rejection of this "new" evidence was inadequate. The Court agrees.

While "[a] treating physician's statement that the claimant is disabled cannot itself be determinative," Snell, 177 F.3d at 133, the "Appeals Council must give good reasons for the weight it assigns to a plaintiff's treating physician's opinion." Shrack v. Astrue, 608 F.Supp.2d 297, 302 (D. Conn. 2009) (adopting report and recommendation) (citing Snell, 177 F.3d at 134 (remanding the case to the Appeals Council when it failed to explain why plaintiff's treating physician's finding of disability was rejected)); Hynes, 2013 WL 3244825, at *12 ("The Court finds that not only should the ALJ have more fully developed the record by recontacting Dr. O'Connor, but that once Dr. O'Connor submitted additional evidence, that the Appeals Council failed to adequately explain its reasons for denying review."); Richardson v. Apfel, 44 F. Supp. 2d 556, 564 (S.D.N.Y. 1999) ("Absent a valid explanation as to why the Appeals Council failed to seek out the clinical or diagnostic findings it required . . . the court is not satisfied that the Commissioner has fulfilled his affirmative obligation under the Social Security regulations and Second Circuit jurisprudence.").

To be sure, the affirmations may have limited probative value. Indeed, Dr. Parisi's main observation – that Miller could not perform substantial gainful activity after October 31, 2006 – simply echoed a finding made by the ALJ. However, it was the Commissioner's affirmative duty to explain its reasons for discounting the opinions of the Plaintiff's treating physicians. "Therefore, having reviewed the entire record, including the ALJ's decision, plaintiff's ["additional'] evidence that was submitted to the Appeals Council, and the Appeals Council

decision, the Court finds that the Commissioner made legal errors because both the ALJ and the Appeals Council failed to adequately explain why it discounted the opinions of plaintiff's treating physician[s]." Hynes, 2013 WL 3244825, at *12.

### IV. CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED,** that the Commissioner's motion for judgment on the pleadings is denied; and it is further

**ORDERED,** that the Plaintiff's cross-motion for judgment on the pleadings is granted in part and denied in part; and it is further

**ORDERED,** that the decision of the Commissioner is reversed; and it is further

**ORDERED,** that this case is remanded to the ALJ for further proceedings consistent with this Memorandum of Decision and Order. Specifically, on remand, the ALJ must consider all of the treating physicians' submissions regarding the Plaintiff's disability, and if the ALJ chooses to discount those opinions, he must, as outlined in the case law and regulations, explain in detail his decision; and it is further

**ORDERED,** that the Clerk is directed to close this case.

**SO ORDERED.**
Dated: Central Islip, New York
December 30, 2013

                                                           *Arthur D. Spatt*
                                                       ARTHUR D. SPATT
                                                   United States District Judge